*Decisions will be entered under Rule 50.*

HUGH H. SMITH AND EVELYN J. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GEORGE W. SMITH AND BETTY SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4503–70, 4504–70. Filed August 21, 1972.

*Joseph A. Lukes*, for the petitioners.
*Edward B. Simpson*, for the respondent.

---

[17] Since petitioners acted on advice of counsel, the additions to tax under sec. 6651(a) do not apply.

TIETJENS, *Judge:* In these consolidated cases the Commissioner determined deficiencies in income tax as follow:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Hugh H. Smith and Evelyn J. Smith | 4503-70 | 1966 | $1,637.56 |
|  |  | 1967 | 1,424.98 |
| George W. Smith and Betty Smith | 4504-70 | 1964 | 1,314.69 |
|  |  | 1965 | 3,674.16 |
|  |  | 1966 | 2,329.87 |
|  |  | 1967 | 1,220.21 |

All items of the deficiencies save one have been disposed of by settlement; the remaining issue concerns the holding period of certain realty sold by petitioners, specifically, whether the benefit of tacking holding periods is available so as to qualify the sales as long-term capital gains rather than short-term capital gains.

### FINDINGS OF FACT

George Smith and Betty Smith are married individuals who resided at San Bruno, Calif., at the time of the filing of their petition. Their Federal income tax returns for the years 1964, 1965, 1966, and 1967 were filed with the district director of internal revenue, San Francisco, Calif. Hugh Smith, the brother of George Smith, and his wife Evelyn resided at Millbrae, Calif., at the time of filing their petition. Their Federal income tax returns for the years 1966 and 1967 were filed with the district director of internal revenue, San Francisco, Calif. George and Hugh are hereinafter referred to as petitioners.

On February 2, 1960, each petitioner acquired an undivided one-half interest in a 7½-acre parcel of unimproved land known as "Rockhill," located in Daly City, Calif. In August 1963 petitioners sold the entire parcel, still unimproved, to E. T. and Maye E. Komsthoeft for $400,-000.

Rockhill was a capital asset in the hands of petitioners, and the income reportable from the installment obligation acquired in the financing of the sale to the Komsthoefts was capital gain. Petitioners took a downpayment of $90,000 and a purchase-money mortgage and note of $310,000. The note was secured by a deed of trust which contained a subordination clause and a release clause. The terms of the note provided for three minimum annual principal payments of $103,-333.33 in 1964, 1965, and 1966 with 6-percent interest on the unpaid principal balance, although the obligors could arrange to pay more than one-third of the principal during the years in which the first two installments were due and the obligees reserved the right to refuse payments of principal during 1963.

The development of Rockhill into a residential area was one of the objectives of the sale to the Komsthoefts. Eighteen fourplexes or four-apartment buildings were constructed on part of the acreage by the Komsthoefts; nine of the fourplexes were sold by them while they had title to Rockhill. The release clause in the deed of trust to petitioners facilitated the discharge from petitioners' lien of the individual fourplexes as they were sold. The subordination clause made it possible for the Komsthoefts to secure outside construction financing. Promptly after the purchase of Rockhill the Komsthoefts received from the Lytton Savings & Loan Association of Northern California several construction loans in the aggregate amount of $729,000. Petitioners subordinated their first lien to these loans.

In addition to their downpayment, the Komsthoefts paid $103,333.33 on their note in 1964 and $60,300 in 1965. They defaulted in mid-1965. Petitioners reported income from the payments received on the installment basis pursuant to section 453(b).[1] The gross profit ratio on the note was 93.899 percent so that $238,136.33 out of the $253,633.33 was returnable and reported by them in their returns for 1963, 1964, and 1965.

At a trustee's sale arranged pursuant to the terms of the deed of trust on January 14, 1966, the unsold portion of Rockhill was bid in by petitioners for the unpaid balance of the $310,000 note or $146,366.67. The trustee conveyed title to petitioners. Petitioners transferred the Komsthoefts' note to the trustee, and petitioners paid expenses in connection with the sale that equaled $5,911.77. Petitioners also assumed all the outstanding construction loans which at that time equaled $361,485.25, by prior agreement between them and Lytton Savings & Loan Association. Petitioners' recognized gain upon the repossession was limited by the provisions of section 1038. Under section 1038(c), Rockhill had a basis to petitioners when they received it from the trustee equal to $376,340.02, being the sum of the expenses of sale, the amounts of the assumed construction loans, and $8,943, the adjusted basis of the Komsthoefts' note.

Petitioners sold two of the nine remaining fourplexes within 6 months after the date of the repossession of Rockhill by petitioners through the trustee's sale. Eighty Komsthoeft Court was sold in March 1966 for $51,989 and 98 Komsthoeft Court was sold in June 1966 for $53,000. In the notices of deficiency the Commissioner allocated 98.6 percent of the gain realized from the sale of 80 Komsthoeft Court to the building, and 1.4 percent to the land on which the building is situated; 99.2 percent of gain realized on the sale of 98 Komsthoeft Court was attributed to the building and 0.8 percent to the land. The Commis-

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

sioner also determined that the basis of each of the buildings was exactly equal to the amount of the specific construction loans assumed with respect to each; 80 Komsthoeft Court was subject to a $40,182.48 debt and 98 Komsthoeft Court was subject to a $40,189.48 debt.

## OPINION

The parties agree that the gain on the sales of 80 and 98 Komsthoeft Court is capital gain, but disagree as to whether the major part of the gain, that being attributable to the buildings, is long-term or short-term. The sales of these properties occurred less than 6 months after the date of the trustee's conveyance of title to petitioners and thus the issue narrows to that of the availability of "tacking." In the notices of deficiency the Commissioner treated the gain attributable to the land only as long-term capital gain, basing his determination on his interpretation, which he advances today, of section 1.1038–1 (g) (3), Income Tax Regs. The regulation, which supports the Commissioner's position in this case, provides in part as follows:

(3) *Holding period of reacquired property.* Since the reacquisition * * * is in a sense considered a nullification of the original sale of the real property, for purposes of determining gain or loss on a disposition of *such property* after its reacquisition the period for which the seller has held the real property at the time of such disposition shall include the period for which such property is held by him prior to the original sale. However, the holding period shall not include the period of time commencing with the date following the date on which the property is originally sold to the purchaser and ending with the date on which the property is reacquired by the seller. * * * [Emphasis supplied.]

The Commissioner interprets the phrase "such property" where it occurs in the quoted language to mean only the realty as it existed at the time of the original sale. Since Rockhill was unimproved at the time of the sale to the Komsthoefts, the Commissioner concludes that the fourplexes do not acquire the holding period of the previously unimproved land in petitioners' hands.

Petitioners concede that the Commissioner's interpretation is reasonable and we think that it is correct. An owner of unimproved real estate who places a building thereupon does not acquire a holding period for the building that begins with the date he acquired the land. Rather he has two holding periods, that of the land and that of the building, which commence with the respective dates of acquisition of each. *Dunigan* v. *Burnet*, 66 F. 2d 201 (C.A. D.C. 1933), affirming 23 B.T.A. 418 (1931); *Paul* v. *Commissioner*, 206 F. 2d 763 (C.A. 3, 1953), reversing on a related issue 18 T.C. 601 (1952); *Fred Draper*, 32 T.C. 545, 548–549 (1959). To permit petitioners to tack the holding period of the unimproved land held prior to the original sale to that of the after-acquired fourplexes would place petitioners in a position more

favorable than that of the landowner who improves his own real estate. We see no warrant for that.

Petitioners have made an alternative argument which focuses on the general tacking provisions of section 1223 and upon which they chiefly rely and to which the parties have devoted most of their attention on brief. Although we conclude that section 1.1038–1(g)(3), Income Tax Regs., calls for a decision adverse to petitioners, we must determine that nothing in the enacted law, particularly in the sections of the Internal Revenue Code cited to us by petitioners, is contrary to the regulation or to our interpretation of the regulation.

The fundamental principle enshrined in section 1223(1) [2] holds that if property is acquired in an exchange in which the property acquires a substituted basis, the holding period of the property will be augmented by the holding period of property surrendered therefor in the exchange. Petitioners argue that the repossession of Rockhill constituted a nontaxable exchange in which petitioners acquired a basis for the realty which was based in part, due to the provisions of section 1038(c),[3] on the adjusted basis of the installment purchase-money obligation surrendered. Petitioners correctly observe that the installment obligation was a capital asset since it bore the same character as the real estate for which it was received. Sec. 453(d)(1). It is true also that when an aggregate of assets is received, the basis of the property surrendered must generally be allocated in a reasonable fashion among the several components of the aggregate. Sec. 1.61–6(a), Income Tax Regs.; *Fairfield Plaza, Inc.*, 39 T.C. 706, 712 (1963). It takes only one further assertion— that part of the basis allocable to the fourplexes is traceable to the installment obligation—to reach the conclusion that the holding period of the installment obligation may be tacked, so that 80 and 98 Komsthoeft Court may acquire a holding period of more than 6 months.

---

[2] SEC. 1223. HOLDING PERIOD OF PROPERTY.

For purposes of this subtitle—

(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231. * * *

[3] SEC. 1038. CERTAIN REACQUISITIONS OF REAL PROPERTY.

(c) BASIS OF REACQUIRED REAL PROPERTY.—If subsection (a) applies to the reacquisition of any real property, the basis of such property upon such reacquisition shall be the adjusted basis of the indebtedness to the seller secured by such property (determined as of the date of reacquisition), increased by the sum of—

(1) the amount of the gain determined under subsection (b) resulting from such acquisition, and

(2) the amount described in subsection (b)(2)(B).

If any indebtedness to the seller secured by such property is not discharged upon the reacquisition of such property, the basis of such indebtedness shall be zero.

We agree with every contention of petitioners except their last. In the notices of deficiency the Commissioner gave to each fourplex a basis equal to no more than the amount of the unsatisfied balance of the specific construction loan with which it was encumbered, roughly $40,000 each in the case of 80 and 98 Komsthoeft Court. We would be disinclined to disturb that allocation, which does not attribute any of the adjusted basis of the installment obligation to the buildings. Apart from their suggestion that part of the basis of the buildings ought to be traceable to the installment obligation, petitioners have failed to propose an alternative method of allocation which could substitute for the Commissioner's although this would be necessary for them to prevail on this point. *Cleveland-Sandusky Brewing Corp.*, 30 T.C. 539, 545 (1958). The Commissioner's allocation is a reasonable one; it roughly parallels the ratio of the fair market values of the land and buildings as disclosed by the notices of deficiency. The manner in which the Commissioner allocated the gain between land and buildings, to which petitioners have made no objection, shows that the value of the land alone constituted a minor part of the value of each parcel and that most of the gain was attributable to the buildings.

Petitioners' only apparent purpose in seeking to spread a small fraction of the adjusted basis of the installment obligation, which adjusted basis is less than $9,000, over each of the nine remaining fourplexes is to call section 1223(1) into play. We doubt that the policy of that section supports such a procedure. Moreover we doubt that the policy behind the practice of allocating basis, which is to ensure the recovery of one's investment ratably upon the separate disposition of each of the individual components of an aggregate of assets, would be advanced thereby.

We recognize, of course, that an allocation of the *amount* of basis is not per se determinative of the existence of a substituted basis for the purpose of deciding whether the tacking provisions of section 1223(1) apply. Where, however, as is the case herein, the allocation is reasonable and reveals that there is no substituted basis for the property in question, section 1223(1) simply does not come into play. In short, we conclude, on the facts of this case, that no part of the unpaid balance of the unrecovered basis of petitioners' installment obligation was properly allocable to the buildings and that all of such basis was allocable to the land.

As we can discern no other legal authority that would be contrary to our conclusion as to section 1.1038–1(g)(3), Income Tax Regs., we hold that the holding period of the fourplexes at 80 and 98 Komsthoeft Court was less than 6 months.

*Decisions will be entered under Rule 50.*